Sarah McMillan
WildEarth Guardians
P.O. Box 7516
Missoula, MT 59807
(406) 549-3895
smcmillan@wildearthguardians.org

Rebecca Fischer (CO Bar No. 51604)
WildEarth Guardians
2590 Walnut Street
Denver, Colorado 80205
(406) 698-1489
rfischer@wildearthguardians.org
*pro hac vice application pending*

Samantha Ruscavage-Barz (NM Bar No. 23276)
WildEarth Guardians
516 Alto Street
Santa Fe, New Mexico 87501
(505) 401-4180
sruscavagebarz@wildearthguardians.org
*pro hac vice application pending*

*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| WILDEARTH GUARDIANS,<br><br>        Plaintiff,<br><br>    v.<br><br>ELAINE L. CHAO, in her official capacity as Secretary of the U.S. Department of Transportation; THE U.S. DEPARTMENT OF TRANSPORTATION, a federal department; HOWARD ELLIOT, in his official capacity as Administrator of the Pipeline and Hazardous Materials Safety Administration; THE PIPELINE AND HAZARDOUS MATERIALS SAFETY | Case No. CV 18-110-GF-BMM<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

ADMINISTRATION, a federal agency
within the Department of
Transportation,

       Defendants.

## INTRODUCTION



    1.  This case is about the failure of the Department of Transportation, a

federal department under the executive branch, and the Pipeline and Hazardous

Materials Safety Administration ("PHMSA"), a federal agency within the

Department of Transportation, collectively "Defendants," to ensure the annual

examination and inspection of an extensive network of oil and gas pipelines and

associated facilities on publicly-owned, federally-managed lands throughout the United States.

2.   After intensive investigation, and based on information and belief, Plaintiff WildEarth Guardians ("Guardians") has discovered that Defendants are violating the Mineral Leasing Act ("MLA"), 30 U.S.C. §§ 181–287. Specifically, the MLA requires that, "[p]eriodically, but at least once a year, the Secretary of the Department of Transportation shall cause the examination of all [oil and gas] pipelines and associated facilities on Federal lands and shall cause the prompt reporting of any potential leaks or safety problems." 30 U.S.C. § 185(w)(3).

3.   Over the course of at least the last six years, Defendants have chronically failed to cause the annual examination of a certain set of oil and gas pipelines and associated facilities on federal lands in the United States. Defendants continue to fail to cause the annual examination of this set of pipelines in violation of Section 185(w)(3) of the MLA as of the filing of this Complaint.

4.   As a result, Guardians hereby brings this civil action for injunctive and declaratory relief against the above-named Defendants for past and continuing violations of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, and the Mineral Leasing Act ("MLA"), 30 U.S.C. § 185(w)(3).

**JURISDICTION AND VENUE**

5.  This action arises under the MLA, 30 U.S.C. §§ 181–287, and the APA, 5 U.S.C. §§ 701–706.

6.  This Court has jurisdiction over the action pursuant to 28 U.S.C. §§ 1331 and 1346 because Guardians' claims present a federal question and involve the United States as defendant.

7.  The challenged agency actions are final and subject to judicial review under the APA. 5 U.S.C. §§ 701–706.

8.  An actual, justiciable controversy exists between Guardians and Defendants within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201.

9.  Guardians' interests will be adversely affected and irreparably injured if Defendants continue to violate the MLA. These injuries are concrete and particularized, and fairly traceable to Defendants' failure to perform their mandatory duties.

10.  The requested relief would redress the actual, concrete injuries to Guardians and is otherwise proper under 28 U.S.C. § 2201 (declaratory relief), 28 U.S.C. § 2202 (injunctive relief), and 28 U.S.C. § 2412 (Equal Access to Justice Act costs and fees).

11.     Venue is appropriate in this Court and within the Great Falls Division pursuant to 28 U.S.C. § 1391(e)(1)(B) because a number of the pipelines at issue pass through federal public lands in Blaine, Choteau, Fergus, Phillips, Pondera, Toole, and Valley Counties within the Great Falls Division. Therefore, a substantial part of the property and events or omissions giving rise to this claim occurred in this district. Venue is also proper in this Court because Guardians has members and supporters who reside in this district. *Id.* § 1391(e)(1)(C).

**PARTIES**

12.     Plaintiff WILDEARTH GUARDIANS is a non-profit membership organization based in Santa Fe, New Mexico, with offices throughout the Western United States, including in Missoula, Montana; Denver, Colorado; Portland, Oregon; Seattle, Washington; and Tucson, Arizona. Guardians' mission is to protect and restore the wildlife, wild places, wild rivers, and health of the American West. To fulfill this mission, Guardians works to confront the harmful impacts of fossil fuel production and consumption and to advance a transition to clean, renewable energy in order to safeguard public health, the environment, and the climate.

13.     Guardians has over 220,000 members and supporting activists, many of whom live, work, and/or recreate on and near the public lands over the federal pipeline rights-of-way that are the subject of this Complaint. Guardians' members

and supporters regularly use and enjoy the cultural resources, wildlands, wildlife habitat, rivers, streams, and healthy ecosystems on federal public lands in Montana, Colorado, Nevada, New Mexico, Utah, Wyoming, and other states, including federal lands above and adjacent to the federal oil and gas pipelines and associated facilities at issue in this Complaint. Guardians' members and supporters use these affected lands for camping, fishing, hiking, hunting, photographing scenery and wildlife, wildlife viewing, aesthetic enjoyment, and engaging in other vocational, scientific, and recreational activities.

14.     Guardians' members and supporters derive recreational, inspirational, scientific, educational, aesthetic, and physical and mental fitness benefits from their activities on lands that include the federal public lands above and adjacent to oil and gas pipelines and associated facilities at issue in this Complaint.

15.     Oil and gas pipelines stretch extensively across public lands in the western United States, particularly in Montana, Colorado, Nevada, New Mexico, Utah, and Wyoming, where significant oil and gas production occurs. Below is a map prepared by Guardians illustrating oil and gas pipelines on federal lands in just one area of the western U.S. This map shows oil and gas pipelines approved by the Bureau of Land Management ("BLM") in Montana near and within the Upper Missouri River Breaks National Monument. Guardians prepared the map using BLM data.



16.     These pipelines and their associated facilities are impossible not to notice when recreating outdoors on public lands; they are marked by signs, surface installations, and other related equipment. Below are examples of oil and gas pipelines observed by Guardians' members while recreating on public lands in central Montana in 2018, in western Colorado in June and September 2017, and in New Mexico in June 2017.





17.     While visiting and enjoying public lands, which are primarily managed by the BLM, Guardians' members have frequently come across oil and gas pipelines and associated facilities including:

- On March 5, 2018, Guardians' members visited and enjoyed public lands in the Upper Missouri River Breaks National Monument to the south of Big Sandy, Montana and near the town of Loma, Montana. In this visit, Guardians' members came across oil and gas pipelines, including an oil and gas pipeline that the BLM has assigned serial number MTM-098185.

- On June 14, 2017, Guardians' members visited and enjoyed public lands north and west of Grand Junction, Colorado in the Book Cliffs area of Mesa and Garfield Counties where a natural gas pipeline is located. According to BLM, this pipeline is assigned serial number COC-050897. A picture of this pipeline is below.



- On June 28, 2017, Guardians' members visited Chaco Culture National Historical Park in New Mexico and took photographs, picnicked, hiked, and otherwise enjoyed the lands in and surrounding the park, including federal public lands overlying an oil pipeline northeast of Nageezi, New Mexico and north of Chaco Culture National Historical Park in San Juan County. BLM assigned this pipeline serial number NMNM-130770. According to BLM, the right-of-way for NMNM-130770 is held by Williams Four Corners Inc., a company that has reported frequent spills in New Mexico, as detailed below.

- On September 5, 2017, Guardians' members visited public lands on top of and adjacent to a natural gas pipeline located west of DeBeque,

Colorado in Mesa County. BLM assigned this pipeline serial number COC-031077A. The visit was to explore and enjoy the desert landscape in this area and to view wildlife.

- On September 15, 2017, Guardians' members visited public lands in the McInnis Canyons National Conservation Area north and west of Grand Junction in western Colorado. During the visit, the members came across markers for an oil and gas pipeline. According to the BLM, this pipeline is assigned serial number COC-029366.

18.     The above are just a few recent examples. Overall, Guardians' members regularly (i.e., at least once a year) come into contact with oil and gas pipelines and associated facilities on federal lands while using these lands for camping, fishing, hiking, hunting, photographing scenery and wildlife, wildlife viewing, aesthetic enjoyment, and engaging in other vocational, scientific, and recreational activities.

19.     While recreating on public lands on top of and near oil and gas pipelines and associated facilities, Guardians' members have come across unsightly oil spills, rusted equipment and installations, sounds of leaking gas, and smells of oil and gas. For instance, when recreating on public lands near DeBeque, Colorado in September 2017, Guardians' members smelled and heard gas leaking from a natural gas pipeline installation. These sights, sounds, and smells detract

from Guardians' members' enjoyment of recreating outdoors on public lands and pose health risks to Guardians' members.

20.     Guardians members are also concerned about the short-term and long-term health impacts from exposure to leaks and spills from oil and gas pipelines and associated facilities on federal public lands. Health impacts from oil and gas releases are well-documented. For example, health officials in Michigan documented the short-term health impacts of a massive oil spill (800,000 gallons) from an Enbridge Energy pipeline in July 2010 near Kalamazoo, Michigan.[1] Officials found that 144 individuals visited nearby hospitals to receive treatment of symptoms including headaches, nausea, respiratory issues such as coughing or choking.

21.     Oil and gas pipeline leaks emit benzene, toluene, ethylbenzene, xylene, or other volatile organic compounds ("VOCs"). There is evidence that long-term exposure to these substances can cause long-term impacts, such as an increased risk of cancer.[2] More than 25% of chemicals used in oil and gas

---

[1] *See* Michigan Dep't of Community Health, *Acute Health Effects of the Enbridge Oil Spill* 6–8 (Nov. 2010), http://www.michigan.gov/documents/mdch/enbridge_oil_spill_epi_report_with_cover_11_22_10_339101_7.pdf.

[2] T. Colborn et al., *Natural Gas Operations from a Public Health Perspective*, 17 Hum. Ecol. Risk Assess. 1038, 1044–47 (2011), https://www.biologicaldiversity.org/campaigns/fracking/pdfs/Colborn_2011_Natural_Gas_from_a_public_health_perspective.pdf.

operations can cause cancer and mutations.[3] Exposure to these chemicals can occur through small leaks on oil and gas pipelines or large spills. Guardians' members are concerned about the health risks from exposure to these chemicals because of Defendants' failure to cause the annual examination of pipelines and associated facilities on federal lands.

22.    Guardians' members intend to continue to use and enjoy public lands above and near oil and gas pipelines, including the pipelines which Defendants are failing to examine. Guardians' members' enjoyment of these public lands will be adversely affected and diminished as a result of Defendants' failure to cause the examination of oil and gas pipelines and associated facilities on federal lands. The failure of Defendants to fulfill their duty to ensure oil and gas pipelines on federal lands are inspected at least once annually means that spills, leaks, and general degradation of these facilities are more likely to occur. Guardians' members have already been harmed by the sights, sounds, smells, and increased risk of health impacts from leaking oil and gas pipelines on federal lands. Defendants' failure to cause the examination of these and other pipelines means these health risks, sights, sounds, and smells will persist and potentially increase.

23.    A favorable ruling in this case would redress the harms that Guardians' members are suffering and will continue to suffer as a result of

---

[3] *Id.*

Defendants' actions and inactions. If Defendants cause oil and gas pipelines and associated facilities on federal lands to be examined at least once a year, the likelihood of undetected leakage and spills will decrease. Guardians' members would thereby be able to fully use and enjoy federal public lands without facing interference from and concerns about exposure to risky, unsightly, loud, and/or smelly pipelines and associated facilities.

24.   Defendant ELAINE L. CHAO is sued in her official capacity as the Secretary of the Department of Transportation. Secretary Chao is responsible for the administration of the transportation systems in the United States, including overseeing the activities of PHMSA and ensuring that the agency complies with federal law, including the Mineral Leasing Act.

25.   Defendant DEPARTMENT OF TRANSPORTATION is a federal department responsible for oversight over the federal transportation system of the United States, including oversight over PHMSA.

26.   Defendant PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION ("PHMSA") is a federal agency within the Department of Transportation and is responsible for managing the pipeline systems in the United States, including oil and natural gas pipelines and associated facilities sited on federal lands in Montana, Colorado, Nevada, New Mexico, Utah, and Wyoming. PHMSA is also responsible for ensuring safety in the design, construction,

operation, and maintenance planning for natural gas and hazardous liquids

pipelines, including crude oil.

27.     Defendant HOWARD "SKIP" ELLIOT is the Administrator of

PHMSA and is responsible for the agency's operations, including managing oil

and natural gas pipelines and associated facilities sited on federal lands in

Montana, Colorado, Nevada, New Mexico, Utah, and Wyoming.

## LEGAL BACKGROUND

### I.   The Mineral Leasing Act

28.     Congress enacted the MLA in order "to promote wise development of

[the nation's] natural resources and to obtain for the public a reasonable financial

return on assets that belong to the public." *Devon Energy Corp. v.

Kempthorne*, 551 F.3d 1030, 1033 (D.C. Cir. 2008) (quoting *California Co. v.

Udall*, 296 F.2d 384, 388 (D.C. Cir. 1961)).

### A.   Duties of the Secretary of Interior

29.     The Secretary of Interior, through the BLM, is the main federal entity

in charge of carrying out the requirements of the MLA. *See* 30 U.S.C. § 21a.

30.     For example, the Secretary may lease public minerals, including oil

and gas, and obtain royalties for those leases. *See, e.g.*, *id.* § 201 (coal), § 226 (oil

and gas). The Secretary of the Interior may also grant rights-of-way through

federal lands for pipelines that transport "oil, natural gas, synthetic liquids or

gaseous fuels, or any refined product produced therefrom." *Id.* § 185(a). Federal

lands are defined as "all lands owned by the United States except lands in the

National Park System, lands held in trust for an Indian or Indian tribe, and lands on

the Outer Continental Shelf." *Id.* § 185(b).

### B.      Duties of the Secretary of Transportation

31.      Although almost all of the duties under the MLA apply to the

Secretary of the Interior, the Secretary of the Department of Transportation has one

duty under the Act. Specifically, the Transportation Secretary "shall cause the

examination of all [oil and gas] pipelines and associated facilities on Federal lands

and shall cause the prompt reporting of any potential leaks or safety problems"

"periodically, but at least once a year." *Id.* § 185(w)(3). Congress did not

specifically define "associated facilities" in the MLA. The MLA does define

"related facilities" as including, but not limited to, "valves, pump stations,

supporting structures, bridges, monitoring and communication devices, surge and

storage tanks, terminals, roads, airstrips and campsites." *Id.* § 185(d).

32.      The Secretary of the Interior approves and manages oil and gas

pipeline rights-of-way. The Secretary of Transportation ensures that annual

examination of oil and gas pipelines and associated facilities constructed and

operated pursuant to Interior's approval occurs.

33.     The legislative history of the MLA indicates that Congress

purposefully gave the Department of Transportation oversight over oil and gas

pipelines and associated facilities on federal lands to prevent environmental harm.

*See* H.R. Conf. Rep. No. 93-617, at 8 (Oct. 31, 1973) (reconciling the language of

S. 1081 and H.R. 9130 presented through a House Amendment to S. 1081); *see*

*also* 93 Cong. Rec. H 9799, H 9817 (daily ed. Nov. 12, 1973) (comments of Rep.

John Melcher, presenter of H.R. Conf. Rep. No. 93-617). For example,

Representative Mo Udall stated that the House amended the final bill to "direct[]

the Secretary of Transportation to inspect all pipelines and facilities on Federal

lands annually for safety purposes and to report to Congress and the administration

on any safety or environmental hazards." 93 Cong. Rec. H 9799, H 9812 (daily ed.

Nov. 12, 1973). Representative Melcher echoed this sentiment, stating that Section

28(w)(3) is "an important provision, and I intend to learn from DOT and Interior

what procedures will be developed to fully carry it out and when the first

inspections will begin." *Id.* at H 9817.

**C.     Duties of PHMSA**

34.     According to PHMSA's website, the agency's mission is "to protect

people and the environment by advancing the safe transportation of energy and

other hazardous materials that are essential to our daily lives."[4] The agency also "establishes national policy, sets and enforces standards, educates, and conducts research to prevent incidents."[5]

35.     The Department of Transportation has delegated authority to PHMSA to carry out the specific mandate of § 185(w)(3). 49 C.F.R. § 1.97(a)(2). PHMSA's existing pipeline regulations do not cite to this provision as authority. *See generally* 49 C.F.R. §§ 191, 192 (transportation of natural gas by pipeline) and 195 (transportation of hazardous liquids by pipeline).[6]

36.     PHMSA's regulations concerning pipelines stem from various pipeline safety acts passed over the years.[7] PHMSA's regulations do not recognize or carry out the mandate of 30 U.S.C. § 185(w)(3). PHMSA's regulations exempt certain pipelines from annual examination. For example, PHMSA's regulations specifically exempt flow lines[8] from regulations applicable to oil pipelines. 40.

---

[4] PHMSA, "Mission, Vision, Goals," https://www.phmsa.dot.gov/about/mission (last visited July 11, 2018).

[5] *Id*.

[6] *See also* U.S. Gov't Publ'g Office, *Parallel Table of Authorities and Rules* 968 (2017), https://www.govinfo.gov/sites/default/files/media/parallel_table_2017.pdf.

[7] *See* Paul W. Parfomak, Cong. Research Serv., *DOT's Federal Pipeline Safety Program: Background and Key Issues for Congress* 5 (May 20, 2016), https://fas.org/sgp/crs/misc/R44201.pdf.

[8] PHMSA's regulations define "transportation-related oil flow line [to] mean[] a pipeline transporting oil off of the grounds of the well where it originated and across areas not owned by the producer, regardless of the extent to which the oil has been processed, if at all." 49 U.S.C. § 60102(o)(2).

C.F.R. § 195.1(b)(8). Certain natural gas gathering lines[9] are also unregulated. *See* 49 C.F.R. § 192.8(b)(1). Section 185(w)(3) of the MLA does not exempt certain sizes of pipelines from annual examination or inspection.

## II.   The Administrative Procedure Act

37.    The APA provides a right to judicial review for any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute[.]" 5 U.S.C. § 702. Agency action is defined as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, *or failure to act*." *Id.* § 551 (emphasis added). Actions that are reviewable under the APA include final agency actions "for which there is no other adequate remedy in a court." *Id.* § 704.

38.    Judicial review under the APA applies to all agency actions except those "committed to agency discretion by law." *Id.* § 701(a). "[W]hen an agency is compelled by law to act within a certain time period" the action is nondiscretionary and "a court can compel the agency to act." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 65 (2004).

39.    Under the APA, a reviewing court has the power to "compel agency action unlawfully withheld or unreasonably delayed; and hold unlawful and set

---

[9] "Gathering line means a pipeline that transports gas from a current production facility to a transmission line or main." 49 C.F.R. § 192.3.

aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(1), (2)(A).

## FACTUAL BACKGROUND

### I.   The United States Oil and Gas Pipeline System

40.     The United States is crossed by more than 2.6 million miles of pipelines—enough to circle the earth 104 times.[10] Of those, over 137,000 miles are crude oil and refined product pipelines[11] and 2.5 million miles are natural gas pipelines.[12] The map below shows a visual representation of the major gas and hazardous liquid pipelines (including crude oil) in the U.S.[13] It does not include distribution lines or gas gathering lines.[14]

---

[10] U.S Dep't of Transportation, PHMSA, *General Pipeline FAQs*, https://cms.phmsa.dot.gov/faqs/general-pipeline-faqs (last visited July 11, 2018).

[11] U.S. Dep't of Transportation, PHMSA, *Annual Report Mileage for Hazardous Liquid or Carbon Dioxide Systems*, https://cms.phmsa.dot.gov/data-and-statistics/pipeline/annual-report-mileage-hazardous-liquid-or-carbon-dioxide-systems (last visited July 11, 2018).

[12] U.S. Dep't of Transportation, PHMSA, *Annual Report Mileage for Gas Distribution Systems*, https://cms.phmsa.dot.gov/data-and-statistics/pipeline/annual-report-mileage-gas-distribution-systems (last visited July 11, 2018); U.S. Dep't of Transportation, PHMSA, *Annual Report Mileage for Gas Transmission & Gathering Systems*, https://cms.phmsa.dot.gov/data-and-statistics/pipeline/annual-report-mileage-natural-gas-transmission-gathering-systems (last visited July 11, 2018) (using statistics from onshore transmission and gathering lines).

[13] PHMSA, *Gas Transmission and Hazardous Liquid Pipelines* (2018), https://www.npms.phmsa.dot.gov/documents/npms_pipelines_map.pdf.

[14] Nat'l Pipeline Mapping System, *What is the difference between PIMMA and the Public Map Viewer?* https://www.npms.phmsa.dot.gov/WhatPIMMAPVDifference.aspx (last visited July 23, 2018).



41.     Based on right-of-way information obtained from BLM offices in the United States and from BLM's online Legacy Rehost 2000 database,[15] there are more than 700,000 acres of public lands used for oil and gas pipeline rights-of-way.  Most of this acreage is located in the western states of Montana, Colorado, New Mexico, Nevada, Utah, and Wyoming. Guardians estimates that these rights-of-way involve nearly 120,000 miles of oil and gas pipelines.

42.     Oil and gas pipelines come in all sizes and can range from 2 to 42 inches in diameter.[16]

---

[15] Available at https://reports.blm.gov/reports.cfm?application=LR2000.

[16] U.S. Dep't of Transportation, PHMSA, *Natural Gas Pipeline Systems*, https://primis.phmsa.dot.gov/comm/NaturalGasPipelineSystems.htm?nocache=2371 (last visited July 11, 2018); U.S. Dep't of Transportation, PHMSA, *Petroleum Pipeline Systems*, https://primis.phmsa.dot.gov/comm/PetroleumPipelineSystems.htm?nocache=7427 (last visited

43.     In general, a "flow line" is one of the smallest pipelines and is defined

as "the surface pipe through which oil or gas travels from a well to processing

equipment or to storage."[17] Flow lines pose a risk to the public and federal lands. A

2017 review of records kept by state agencies on oil and gas spills found that flow

lines are responsible for more than 7,000 spills, leaks, and accidents since 2009.[18]

44.     "Gathering line means a pipeline that transports gas from a current

production facility to a transmission line or main."[19]

45.     "[T]he vast majority of gas gathering lines – over 220,000 miles

[some ninety-three percent], mostly in rural areas – are excluded from federal

pipeline safety regulations."[20] The report goes on to note that "while some 7% of

gathering lines are currently under federal regulation (discussed later in this

---

July 11, 2018); A Regulatory Review of Liquid and Natural Gas Pipelines in Colorado (2014),
http://cogcc.state.co.us/documents/library/Technical/InterAgency/Final_Pipeline_WhitePaper_w
_Appendices_12_12_14.pdf.

[17] Occupational Safety & Health Admin., U.S. Dep't of Labor, Oil and Gas Home, *Glossary of Terms*, https://www.osha.gov/SLTC/etools/oilandgas/glossary_of_terms/glossary_of_terms
_f.html (last visited July 23, 2018); *see also* A Regulatory Review of Liquid and Natural Gas
Pipelines in Colorado 4 (2014),
http://cogcc.state.co.us/documents/library/Technical/InterAgency/Final_Pipeline_WhitePaper_w
_Appendices_12_12_14.pdf ("Flowlines [sic] contain produced wellhead fluids from individual
wells that feed production facilities near the wellhead.").

[18] Mike Soraghan, *Flow Lines Cited in More Than 7K Spills*, E&E News, May 16, 2017,
https://www.eenews.net/stories/1060054568.

[19] 49 C.F.R. § 192.3; *see also* PHMSA, Gathering Line,
https://primis.phmsa.dot.gov/comm/glossary/index.htm?nocache=3223#GatheringLine (last
visited July 23, 2018).

[20] Parfomak, supra note 5, at 27.

report), the total mileage of U.S. gathering lines is not known precisely."[21]

46.    More gathering lines are scheduled to be built on public lands. As of 2013, gathering lines made up approximately 45% of the planned gas pipeline mileage in the U.S.[22] Unconventional shale gas development, using hydraulic fracturing and horizontal drilling, is responsible for the rapid expansion of gathering lines.[23] PHMSA has acknowledged that "'the framework for regulating gas gathering lines may no longer be appropriate' because the physical characteristics of new shale gas gathering lines [a]re 'far exceeding the historical operating parameters of such lines.'"[24] PHMSA issued a notice of proposed rulemaking in early 2016 to address some of these regulatory gaps. As of the time of filing this Complaint, the agency has not finalized the proposed rule.[25]

47.    "Transmission pipelines are used to transport crude oil and natural gas from their respective gathering systems to refining, processing, or storage facilities.

---

[21] *Id.* at 27.

[22] *Id.*

[23] *Id.*

[24] *Id.* at 28.

[25] *See generally Pipeline Safety: Safety of Gas Transmission and Gathering Pipelines*, 81 Fed. Reg. 20,722 (Apr. 8, 2016), https://www.federalregister.gov/documents/2016/04/08/2016-06382/pipeline-safety-safety-of-gas-transmission-and-gathering-pipelines.

Transmission pipelines also transport refined petroleum products and natural gas to customers, for use or for further distribution."[26]

48. "Distribution line means a pipeline other than a gathering or transmission line."[27] Distribution lines "receive natural gas from transmission pipelines and distribute it to commercial and residential end-users [through mains and service lines]."[28] The graphic below visually demonstrates this system.[29]

**Figure 1.** Oil and gas pipeline system: (a) Oil pipeline system (b) Gas pipeline system, adopted from Natural Gas Pipelines (2015).

different types of infrastructure including bridges, power 2. **Background**

---

[26] PHMSA, *Fact Sheet: Transmission Pipelines*, https://primis.phmsa.dot.gov/comm/FactSheets/FSTransmissionPipelines.htm?nocache=2521 (last visited July 23, 2018).

[27] 49 C.F.R. § 192.3.

[28] PHMSA, *Fact Sheet: Distribution Pipelines*, https://primis.phmsa.dot.gov/comm/FactSheets/FSDistributionPipelines.htm?nocache=5376 (last visited July 23, 2018).

[29] Source: Iqbal et al., Inspection and Maintenance of Oil & Gas Pipelines: A Review of Policies (2017).

49.    This extensive network of pipelines results in actual and potential harm to those working, living, and recreating on federal public lands above or near these pipelines.

## II.    Health Impacts of Pipelines Spills and Failures

50.    A 2011 study on the health effects from oil and gas development found that of the 353 identified chemicals used by the industry, more than 75% can affect the skin, eyes, other sensory organs, the respiratory system, the gastrointestinal system, and the liver.[30] More than 50% of these chemicals also affect the brain and nervous system.[31] Finally, more than 25% of chemicals used in oil and gas operations can cause cancer and mutations.[32]

51.    In particular, raw crude oil and natural gas come out of the ground along with hydrocarbons such as benzene, toluene, ethylbenzene, and xylene (BTEX).[33] The oil and gas industry also adds products containing these chemicals during the hydraulic fracturing process.

52.    According to the Agency for Toxic Substances and Disease Registry, short term exposure to benzene can cause drowsiness, dizziness, rapid heart rate,

---

[30] Colborn, *supra* note 2, at 1045.

[31] *Id.* at 1045.

[32] *Id.* at 1046.

[33] Center for Disease Control, *Interim Guidance for Protecting Deepwater Horizon Response Workers and Volunteers* (July 26, 2010), https://www.cdc.gov/niosh/topics/oilspillresponse/protecting/default.html#effects; Colborn, *supra* note 2, at 1041.

headaches, tremors, confusion, unconsciousness, and long-term exposure can cause cancer of blood forming organs (leukemia).[34] Toluene can impact the brain and nervous system.[35] Ethylbenzene can impact the liver and kidney.[36] Both short and long-term exposure to xylenes can impact the nervous system, causing headaches, dizziness, and confusion. Exposure can also cause irritation of the eyes and respiratory tract.[37]

53.     Pipeline spills and leaks can result in both short and long-term exposures to these chemicals depending on clean-up capabilities.[38]

54.     There is a growing body of research on the mental health community impacts from oil spills as well, including anxiety, post-traumatic stress disorder, and depression.[39]

**III.     Pipeline Failures**

55.     Since 1997, approximately 11,460 incidents have occurred across the

---

[34] Drs. Frederic Leusch & Michael Bartkow, Griffith University, *A Short Primer on Benzene, Toluene, Ethylbenzene, and Xylenes (BTEX) in the Environment and in Hydraulic Fracturing Fluids* 5 (Nov. 17, 2010), https://www.ehp.qld.gov.au/management/coal-seam-gas/pdf/btex-report.pdf (citing to the ATSDR toxicological profile for each chemical).

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *See* Angela Eykelbosh, PhD, *Short-and Long-Term Health Impacts of Marine and Terrestrial Oil Spills: A Literature Review Prepared for the Regional Health Protection Program, Office of the Chief Medical Health Officer, Vancouver Coastal Health* 8 (Aug. 2014), http://www.sjcmrc.org/media/17548/short-and-long-term-health-impacts-of-marine-and-terrestrial-oil-spills.pdf.

[39] *Id.* at 6.

U.S. in relation to federal and state-regulated pipelines.[40] According to PMHSA,

"incident" includes any of the following:

> (1) An event that involves a release of gas from a pipeline, or of liquefied natural gas, liquefied petroleum gas, refrigerant gas, or gas from an LNG facility, and that results in one or more of the following consequences: (i) A death, or personal injury necessitating in-patient hospitalization; (ii) Estimated property damage of $50,000 or more, including loss to the operator and others, or both, but excluding cost of gas lost; (iii) Unintentional estimated gas loss of three million cubic feet or more;
>
> (2) An event that results in an emergency shutdown of an LNG facility. Activation of an emergency shutdown system for reasons other than an actual emergency does not constitute an incident.
>
> (3) An event that is significant in the judgment of the operator, even though it did not meet the criteria of paragraphs (1) or (2) of this definition.

49 C.F.R. § 191.3.

56.     Out of the 11,460 pipeline incidents noted above, there have been 333

fatalities, 1,293 injuries, and over $7.2 billion in damages. A total of 810 incidents,

including 24 fatalities and 76 injuries, have occurred in Colorado, Montana,

Nevada, New Mexico, Utah, and Wyoming from federal and state-regulated

pipelines.

**A.     Montana**

57.     Two major pipeline ruptures have occurred in Montana into the

---

[40] PHMSA, *Pipeline Incident 20 Year Trends*: *All Reported Incident 20 Year Trend*, https://www.phmsa.dot.gov/pipeline/library/data-stats/pipelineincidenttrends (data from 1997 through 2017) (last visited July 23, 2018).

Yellowstone River in the last six years. In July 2011, an Exxon pipeline underneath the river (on state land) burst and spilled 63,000 gallons of crude oil into the river.[41] Clean-up reports following the incident indicate that the spill impacted BLM land.[42]

58.    A similar incident occurred in January 2015 when a pipeline owned by Bridger Pipeline LLC spilled approximately 50,000 gallons into the frozen river.[43] Because the river was frozen, most of the oil was unrecoverable. The company that owns subsidiary Bridger Pipeline LLC has a history of spills, including a spill in Wyoming on BLM land detailed below.

**B.    Colorado**

59.    Colorado has recently experienced two major pipeline-related incidents. On March 3, 2017, more than 5,000 gallons of oil leaked into a seasonal drainage from a 6-inch pipeline owned by Chevron and located under BLM land.[44]

---

[41] Laura Dattaro, *For the Second Time in Four Years, a Pipeline Has Burst on the Yellowstone River*, Vice News (Jan. 20, 2015), https://news.vice.com/article/for-the-second-time-in-four-years-a-pipeline-has-burst-on-the-yellowstone-river.

[42] ExxonMobil Pipeline Co., *Summary of Assessment and Oil Removal Activities: Silvertip Pipeline Incident* 4 (Nov. 2011), https://deq.mt.gov/portals/112/Land/StateSuperFund/Documents/Silvertip/Cleanup%20Reports%20by%20Area/Summary%20of%20Assessment%20and%20Oil%20Removal%20Activities_10Nov11.pdf.

[43] Dattaro, supra note 41.

[44] Dennis Webb, *Chevron Cleaning Rangely Oil Spill*, Grand Junction Sentinel (Mar. 14, 2017), http://www.gjsentinel.com/news/articles/chevron-8232cleaning-8232rangely-8232oil-spill8232.

The spill occurred 7.5 miles northwest of Rangely, Colorado and contaminated 642 cubic yards of soil.

60.     Several animals died as a result of the spill outside of Rangely. The Colorado Oil and Gas Conservation Commission fined Chevron $65,000 for the spill on November 1, 2017.[45] An investigation into the issue blamed the line failure on corrosion and a failure to conduct annual pressure testing.



*Oil coats a seasonal stream half a mile downstream from the March 3, 2017 spill.*

---

[45] The Associated Press, *Colorado Regulators Fine Chevron for Oil Pipeline Spill* (Nov. 1, 2017), http://www.denverpost.com/2017/11/01/colorado-regulators-fine-chevron-pipeline-spill/.

61.     In April 2017, two people were killed in Firestone, Colorado, when a home exploded due to a build-up of natural gas in the soil and basement of their home. The natural gas leaked from a cut flowline connected to an abandoned gas well.[46] Although the flowline was not located in a federal right-of-way, the company who owned the pipeline did not know that the flowline existed. This incident further highlights the lack of oversight over many of these pipelines.

### C.     New Mexico

62.     According to FOIA records Guardians obtained from the BLM, New Mexico has also experienced a number of spills on federal lands. Williams Four Corners has reported approximately one leak on federal lands in almost every month in 2015, 2016, and 2017. According to the New Mexico BLM, on January 26, 2017, a pipeline owned by Williams Four Corners LLC near Chaco Culture National Historical Park vented 24,400 million cubic feet of natural gas when the line froze. Williams reported another natural gas leak in March of 2017 where natural gas escaped for 19.5 hours undetected due to a corroded pipeline on federal land near Navajo Lake State Park.

63.     On November 28, 2016, a pipeline owned by Enterprise Field Services vented 2,587 million cubic feet of natural gas and leaked 35 barrels of

---

[46] Bruce Finley, *Deadly Firestone Explosion Caused by Odorless Gas Leaking from Cut Gas Flow Pipeline*, Denver Post (May 2, 2017), http://www.denverpost.com/2017/05/02/firestone-explosion-cause-cut-gas-line/.

liquids from a BLM right-of-way in Eddy County in the southeastern corner of New Mexico.

### D.  Utah

64.    In Utah in March of 2014, hikers discovered evidence of an unreported oil spill in a wash in Grand Staircase Escalante National Monument.[47] The Monument is managed by the BLM. BLM was unaware of the spill.

### E.  Wyoming

65.    The state of Wyoming consistently experiences pipeline leaks and spills on federal lands. In 2014, a corroded pipeline leaked more than 25,000 gallons (595 barrels) of crude oil 35 miles southwest of Gillette, Wyoming.[48] The oil travelled approximately 3 miles along a seasonal creek bed on federal and state lands. The company that managed the pipeline did not have a valid operating permit.[49] The same company also owned the pipeline that ruptured in January 2015, spilling 50,000 gallons of crude oil into Yellowstone River outside of Glendive, Montana, as discussed above.

66.    According to BLM records received in response to one of Guardians'

---

[47] Brian Maffly, *Hikers Find Unreported Oil Spill into Grand Staircase Monument*, Salt Lake Trib. (Mar. 24, 2014), http://archive.sltrib.com/article.php?id=57728795&itype=CMSID.

[48] Mead Gruver, *Company: Corrosion Caused Wyoming Oil Pipe Spill*, The Washington Times (July 18, 2014), http://www.washingtontimes.com/news/2014/jul/18/company-corrosion-caused-wyoming-oil-pipe-spill/.

[49] Heather Richards, *BLM Confirms True Oil Trespassing at Time of Spill*, Buffalo Bulletin (Mar. 25, 2015), http://www.buffalobulletin.com/news/article_baeb8420-d337-11e4-9959-334073001fd5.html.

FOIA requests, on October 3, 2017, a 16-inch crude oil leaked 720 barrels onto a BLM right-of-way in Fremont County, Wyoming, just south of Yellowstone National Park.

67.    These spills result in contamination on the ground. The spills also contribute to climate change because natural gas is primarily composed of methane.[50] Methane is a potent greenhouse gas, and the impact of methane released into the atmosphere is 25 times that of carbon dioxide.

68.    PHMSA's website[51] provides some details and statistics on its inspection work. PHMSA agency does not differentiate between inspections of pipelines on private lands versus public lands. PHMSA recognizes that the agency's inspection actions have decreased serious pipeline incidents since 2009 by 20%. This decrease in pipeline incidents demonstrates that when PHMSA conducts inspections, pipeline incidents generally decrease.

## IV.    Guardians' Freedom of Information Act Requests to PHMSA

69.    Over the course of the last three years, Guardians has submitted three requests to PHMSA under the Freedom of Information Act, 5 U.S.C. § 552. Guardians' FOIA requests were seeking records demonstrating whether the agency is meeting its duties under the MLA.

---

[50] Envtl. Prot. Agency, *Overview of Greenhouse Gases: Methane*, https://www.epa.gov/ghgemissions/overview-greenhouse-gases (last visited July 23, 2018).

[51] PHMSA, *Pipeline Inspections 101*, https://www.phmsa.dot.gov/pipeline/inspections (last visited July 23, 2018).

### A.     First FOIA Request - December 8, 2014

70.     On December 8, 2014, Guardians submitted a FOIA request to the U.S. Department of Transportation PHMSA FOIA Officer asking for: "[a]ll records related to the Department's responsibilities under 30 U.S.C. sec. 185(w), including but not limited to all records related to the Secretary's responsibility to 'cause the examination of all pipelines and associated facilities on Federal lands' for each year since 2009." Guardians also requested records related to "the prompt reporting of any potential leaks or safety problems" for pipelines on federal lands.

71.     PHMSA responded to this initial FOIA request on December 29, 2014, with 384 pages of accident reports related to Guardians' request for records on leaks and safety problems. The agency did not release any records regarding the duty to inspect under MLA § 185(w)(3).

72.     On January 13, 2015, Guardians administratively appealed PHMSA's failure to release documents relating to Section 185(w)(3).

73.     On March 12, 2015, PHMSA released an additional 30 pages of records in response to the appeal. None of the responsive records related to Section 185(w)(3).

### B.     Second FOIA Request - March 4, 2015

74.     While the appeal for the first FOIA request was ongoing, Guardians submitted a second FOIA request on March 4, 2015, asking for:

33

All records related to the Secretary's responsibilities under 30 U.S.C. § 185(w)(3) to "cause the examination of all pipelines and associated facilities on Federal lands" for each year since 2009 for all Federal lands located in states other than Colorado, Montana, New Mexico, Utah, and Wyoming. Please also include all records related to or identifying any pipelines or associated facilities on Federal lands for which the Secretary has not caused an examination in any year since 2009 in these states.

75.    On March 16, 2015, PHMSA responded to Guardians' request and asked for a 10-day extension. Guardians and PHMSA staff then met on March 25, 2015 to clarify the request. At that meeting, a PHMSA staffer admitted that the agency did know of the statutory requirement under Section 185(w) of the MLA to cause inspection of pipelines annually. PHMSA claimed that its regulations at 49 C.F.R §§ 190–199, specifically sections 192 and 195, caused the inspection of all pipelines under PHMSA's purview.

76.    Following the March 25, 2015 meeting, Guardians identified a subset of 35 oil and gas pipeline rights-of-way on federal lands administered by the BLM[52] and sent PHMSA the case recordation reports for them. The case recordation reports included serial numbers for the rights-of-way, the names and addresses of the rights-of-way holders, the total acreages of the rights-of-way, the length and width of the rights-of-way, and other information such as pipeline diameter. Guardians submitted this information to PHMSA on April 1, 2015.

77.    On April 23, 2015, PHMSA provided its first installment of records

---

[52] *See* Appendix A for the list of the 35 rights-of-way identified by Guardians.

which consisted of 93 pages of responsive records for one specific pipeline right-of-way in Wyoming (WYW-05139). PHMSA did not provide any responsive records for the 34 other rights-of-way in Guardians' April 1, 2015, request.

78.     On May 4, 2015, PHMSA provided its second and final installment of records consisting of 197 pages of records for six of the requested pipelines (CACA-012421, CA-052372, COC-051280, NMNM-090310, UTU-079766, UTU-089112). None of these records contained information regarding inspections under Section 185(w) of the MLA. In its response, PHMSA indicated that it could not locate any inspection records for the remaining 28 pipelines. PHMSA also stated that it did not believe it had jurisdiction over all oil and gas pipelines. PHMSA stated that it "found that the pipelines generally fell into three different categories: 1. Pipelines under PHMSA's jurisdiction that are regulated by PHMSA.  2. Pipelines under PHMSA's jurisdiction but are regulated by individual States.  3. Pipelines not under PHMSA's jurisdiction or regulated by PHMSA."

79.     On June 18, 2015, Guardians filed an administrative appeal challenging the adequacy of PHMSA's response. The basis for Guardians' appeal was that PHMSA limited its response to "inspection records" for the 35 identified pipelines, rather than including all records related to the duty to cause the examination of the pipelines.

80.     The PHSMA FOIA Appeals Officer granted Guardians' June 18th

appeal. PHMSA then conducted an additional search for responsive records.

PHMSA sent a final response letter on September 3, 2015, indicating that it had

not found additional responsive records and that the letter constituted its final

response. No additional correspondence regarding this specific FOIA request has

occurred.

### C.    Third FOIA Request - February 24, 2017

81.    On February 24, 2017, Guardians submitted its third and final FOIA

request to PHMSA asking for:

> Any and all records demonstrating that the DOT Secretary has caused to be
> examined at least once a year all oil and gas pipelines and associated
> facilities on federal lands in the States of Colorado, Kansas, Montana, New
> Mexico, Nevada, North Dakota, Oklahoma, South Dakota, Texas, Utah, and
> Wyoming, pursuant to 30 U.S.C. § 185(w)(3) of the U.S. Mineral Leasing
> Act.

82.    Guardians attached to this FOIA request as "Exhibit 1" a list of all

authorized oil and gas pipeline rights of way approved by the BLM in the states

listed in the previous paragraph. This list presented the BLM assigned serial

numbers for the right of way, the acreage of the right of way, and date of approval.

This list included 32,195 authorized oil and gas pipeline rights-of-way. Guardians

requested that PHMSA provide any and all records demonstrating that it had

caused the examination of the oil and gas pipelines associated with these rights of

way at least once a year.

83.    On March 24, 2017, PHMSA responded by requesting more

information for each pipeline including the operator name, facility name, type of pipeline, and more information on the location. Guardians provided additional information that same day.  For every one of the 32,195 oil and gas pipelines rights of way, Guardians provided information detailing the geographic location of the rights of way (in township, range, and section), the holder of the right of way grant, and the address of the grantee.

84.    PHMSA requested additional clarification on May 31, 2017. PHMSA noted that its inspection records were not organized "by Bureau of Land Management (BLM) serial numbers, pipeline owners, or location by meridian, section, township, and range." PHMSA instead requested pipeline information by operator and city, state, and zip code information.

85.    Guardians responded with follow-up letter on May 31, 2017. Guardians' letter noted that PHMSA likely lacked the responsive records needed. Guardians' letter also requested that the agency should either (1) respond with an explanation as to how it organized its records, or (2) issue a final response indicating that no responsive records existed.

86.    On June 14, 2017, PHMSA complied with the latter request that it issue a final response to Guardians' FOIA request. PHMSA explained that Guardians' "request [was] denied because PHMSA does not track the information

in the manner it was requested," and because Guardians allegedly failed to provide the requested clarification.

87.    Guardians administratively appealed this determination on September 12, 2017. PHMSA's acting administrator granted the appeal on October 10, 2017. On November 9, 2017, PHMSA responded that it had conducted a new search for responsive records, but "did not locate any responsive records."

## V.    PHMSA's Pipeline Regulatory Structure

### A.    Natural Gas Pipeline Regulations, 49 C.F.R. Part 192

88.    PHMSA regulations do not subject natural gas flow lines to regulation. The regulations make no mention of natural gas flow lines. PHMSA fails to comply with MLA § 185(w)(3) with respect to natural gas flow lines.

89.    PHMSA's regulations subject certain, but not all, natural gas gathering lines to regulation.[53]

90.    Unregulated natural gas gathering lines include Type A and Type B gathering lines in a Class 1 location. A Class 1 location includes any class location unit that has ten or fewer buildings intended for human occupancy. 49 C.F.R. § 192.8(b)(1). Type A and Type B unregulated gathering lines are not subject to patrolling to observe surface conditions for indications of leaks and other factors

---

[53] *See* 49 U.S.C. § 60101(a)(21) ("'transporting gas … does not include gathering gas (except through regulated gathering lines) in a rural area outside a populated area designated by the Secretary as a nonrural area").

affecting safety and operation; leakage surveys; or an integrity management program, which includes requirements for identifying high consequence areas ("HCAs")[54] and for periodic assessments of pipeline integrity. *See id.* §§ 192.9(c), 192.705, 192.706, 192.737.  PHMSA fails to comply with MLA § 185(w)(3) with respect to natural gas Type A and Type B unregulated gathering lines in a Class 1 location.

91.     PHMSA also fails to comply with MLA § 185(w)(3) for regulated natural gas gathering lines because it fails to cause the annual examinations of such pipelines. PHMSA fails comply with MLA § 185(w)(3) with respect to natural gas Type A regulated gathering lines in: 1) Class 1 and 2 locations at places other than highway and railroad crossings because patrols are not required annually; 2) Class 1, 2, 3, and 4 locations because leakage surveys are not required annually (except for lines in Class 3 and 4 locations that transport gas without an odor or odorant); and 3) Class 1, 2, 3, and 4 locations because periodic inspections of pipeline integrity do not have to be conducted.

92.     PHMSA also fails to comply with MLA § 185(w)(3) with respect to natural gas Type B regulated gathering lines in: 1) in Class 1, 2, 3, and 4 locations because leakage surveys are not required annually (except for lines in Class 3 and 4 locations that transport gas without an odor or odorant) and 2) in Class 1, 2, 3,

---

[54] HCAs are defined at 49 C.F.R. § 192.903.

and 4 locations because periodic inspections of pipeline integrity do not have to be conducted.

93.     PHMSA also fails to comply with MLA § 185(w)(3) with respect to natural gas transmission lines: 1) in Class 1 and 2 locations at places other than highway and railroad crossings because patrols are not required annually; 2) in Class 1, 2, 3, and 4 locations because leakage surveys are not required annually (except for lines in Class 3 and 4 locations that transport gas without an odor or odorant); 3) because the adequacy of cathodic protection, including certain interference bonds, is not required annually; 4) because continuing surveillance of facilities is not required annually; and 5) because periodic inspections of pipeline integrity are not required annually.

**B.     Oil Pipeline Regulations, 49 C.F.R. Part 195**

94.     PHMSA specifically exempts flow lines from regulations applicable to oil pipelines. 49 C.F.R. § 195.1(b)(8) ("This part does not apply to any of the following: . . . [t]ransportation of a hazardous liquid or carbon dioxide through onshore production (*including flow lines*), refining, or manufacturing facilities or storage or in-plant piping systems associated with such facilities[.]") (emphasis added). PHMSA likely fails to comply with MLA § 185(w)(3) with respect to oil flow lines.

95.     PHMSA's regulations subject certain, but not all, oil gathering and

transmission lines to regulation. In general, PHMSA does not require annual

inspections for pipeline segments that do not affect high consequence areas. *See* 49

U.S.C. § 60109(g); 49 C.F.R. §§ 195.48, 195.12(b)(3).

96.     PHMSA likely fails to comply with MLA § 185(w)(3) with respect to

regulated rural gathering lines and other regulated pipelines: 1) because integrity

inspections are not required for segments that could not affect a HCA; 2) because

reassessments are not required for segments that could not affect a HCA; 3)

because reassessments are not required annually for any segment that could affect

a HCA; 4) because steel pipelines with cathodic protection are not required to be

tested annually; 5) because steel pipelines without cathodic protection are not

required to be tested annually; 6) because onshore pipelines exposed to the

atmosphere are not required to be inspected annually for evidence of atmospheric

corrosion; and 7) because crossings under a navigable waterway are not required to

be inspected annually.

## CLAIM FOR RELIEF

### Violation of the Administrative Procedure Act

97.     Guardians incorporates by reference all preceding paragraphs.

98.     Section 185(w)(3) of the MLA requires that the Secretary of the

Department of Transportation "[p]eriodically, but at least once a year . . . cause the

examination of all pipelines and associated facilities on Federal lands and shall

cause the prompt reporting of any potential leaks or safety problems." 30 U.S.C. § 185(w)(3).

99.    Defendants have unlawfully withheld and unreasonably delayed nondiscretionary agency action required by the MLA.

100.    Based on information and belief, PHMSA is failing to cause the annual examination of natural gas flow lines, unregulated natural gas gathering lines, Type A and B regulated gas gathering lines, and natural gas transmission lines on federal lands as required by MLA § 185(w)(3).

101.    Based on information and belief, PHMSA is failing to cause the annual examination of oil flow lines, unregulated oil gathering lines, regulated oil gathering and transmission lines outside of high consequence areas on federal lands as required by MLA § 185(w)(3).

102.    Defendants are failing to meet their duties under Section 185(w)(3) of the MLA for the 35 oil and gas pipelines identified in Appendix A to this Complaint and for the 32,195 oil and gas pipelines identified in Guardians' February 24, 2017, FOIA request. Defendants have not produced any records indicating they have caused any of these oil and gas pipelines on federal lands and their associated facilities to be examined at least once a year. Defendants are failing to meet their duties under the MLA with regards to every single oil and gas

pipeline on federal lands in the United States. This failure to comply with Section 185(w)(3) of the MLA has occurred for at least the last six years.

103.   Defendants have unlawfully withheld and unreasonably delayed compliance with Section 185(w)(3) of the Mineral Leasing Act, within the meaning of the APA. 5 U.S.C. § 706(1).

## PRAYER FOR RELIEF

WHEREFORE, Guardians respectfully requests that this Court enter a judgment in favor of Plaintiff and issue the following relief:

A.   Declare that Defendants have violated and are violating Section 185(w)(3) of the Mineral Leasing Act by failing to cause annual examinations of oil and gas pipelines and their associated facilities on federal lands;

B.   Issue injunctive relief requiring Defendants to immediately identify all oil and gas pipelines and associated facilities on federal lands, catalogue when they have last been examined, and ensure that each segment and associated facility is examined at least annually in the future;

C.   Retain jurisdiction to enforce compliance with the court's injunction until such time as Defendants demonstrate they are consistently and effectively meeting their duties under the Mineral Leasing Act;

D.   Award Guardians its costs from this action and attorneys' fees as provided by the Equal Access to Justice Act, 28 U.S.C. § 2412(d); and

E.     Grant such other and further relief as the Court deems just and

proper.

Respectfully submitted this 14th day August, 2018.


/s/ Sarah McMillan
Sarah McMillan
WildEarth Guardians
P.O. Box 7516
Missoula, MT 59807
(406) 549-3895
smcmillan@wildearthguardians.org

*Counsel for Plaintiff*

**Appendix A: Public Lands Rights-of-Way Identified by Plaintiff as Representative in the March 4, 2015 FOIA Modification**

| State | BLM Serial Number | Acres | Right-of-way Grantee(s) | County |
|---|---|---|---|---|
| **California** | | | | |
| | CACA012421 | 2.667 | Area Energy LLC | Kern |
| | CA052372 | 47.878 | Kern River Gas Transmission Co. | San Bernardino |
| | CA053525 | 11.334 | Venoco Inc. | Kern |
| | CAS0033318 | 51.870 | ExxonMobil | Kings, Kern |
| | CAS0055722 | 22.670 | Vallecites Ppln. Co. | San Benito, Fresno |
| **Colorado** | | | | |
| | COC018423 | 124.110 | Rocky Mountain Natural Gas LLC | Moffat, Rio Blanco, |
| | COC029366 | 266.750 | Enterprise Gas Processing LLC, Mid-America Pipeline Co. | Rio Blanco, Garfield, Mesa, Montezuma |
| | COC031077A | 138.080 | Red Rock Gathering Co. LLC | Mesa |
| | COC044228 | 162.310 | QEPM Gathering I LLC | Moffat |
| | COC050802 | 49.800 | Maralex Resources Inc. | Garfield |
| | COC051280 | 799.134 | Transco Gas Trans Co.; Transcolorado Gas Trans. Co. | Rio Blanco, Garfield, Mesa, Delta, Montrose, Montezuma, La Plata |
| | COC057006 | 75.770 | Encana Oil & Gas (USA) Inc. | Rio Blanco |
| **Montana** | | | | |
| | MTM0018460 | 176.430 | Bridger Pipeline LLC | Carter |
| | MTM034079 | 225.474 | WBI Energy Midstream LLC | Phillips |
| | MTM079164 | 277.020 | WBI Energy Midstream LLC | Phillips |
| | MTM091539 | 150.670 | WBI Energy Transmission, Inc. | Carter, Fallon |

| | | | WBI Energy | |
| --- | --- | --- | --- | --- |
| | MTM099253 | 166.520 | Midstream LLC | Phillips |
| **New Mexico** | | | | |
| | NMNM090310 | 374.090 | Nustar Logistics LP; Valero Term and Dist. Co. | Otero, Chaves |
| | NMNM016556 | 532.030 | Enterprise Field Services LLC, Mid-America Pipeline Co. Rockies | Sandoval, McKinley, Rio Arriba, San Juan, Guadalupe, Lincoln, Chaves, Debaca |
| | NMNM021401 | 46.530 | Williams Four Corners LLC | San Juan |
| | NMNM024306 | 213.480 | Williams Four Corners LLC | Rio Arriba, San Juan |
| | NMNM080896 | 669.120 | BP America Production Co. | San Juan |
| | NMNM130770 | 39.990 | Williams Four Corners LLC | San Juan |
| **Utah** | | | | |
| | UTU034418 | 92.860 | Enervest Operating LLC | Carbon |
| | UTU059122 | 13.380 | Mar/Reg Oil Co. | Uintah |
| | UTU078815 | 63.020 | XTO Energy Inc. | Emery |
| | UTU079766 | 1019.400 | Unev Pipeline LLC | Juab, Tooele, Millard, Beaver, Ron, Iron, Washington |
| | UTU089112 | 184.490 | QEP Field Services Company | Uintah |
| | UTU092176 | 262.170 | Red Rock Gathering Co. LLC | Uintah, Grand |
| **Wyoming** | | | | |
| | WYW042526 | 87.400 | Overland Trail Trans LLC | Sweetwater |
| | WYW049454 | 249.690 | Wamsutter LLC | Carbon |
| | WYW05139 | 61.982 | Red Butte Pipeline Co. | Big Horn |
| | WYW054953 | 3073.400 | Montana-Dakota Util. | Fremont |

|             |        | Mountain Gas Res.  |            |
|-------------|--------|--------------------|------------|
| WYW118238   | 25.910 | LLC                | Sweetwater |
| WYW152796   | 31.820 | WGR Operating LP   | Lincoln    |